IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JAMES D. SPENCER                                                                    PLAINTIFF


            v.                            CIVIL NO. 15-3031


NANCY A. BERRYHILL,[1] Commissioner
Social Security Administration                                          DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, James D. Spencer, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

## I.       Procedural Background:

Plaintiff protectively filed his current applications for DIB and SSI on August 8, 2008, and July 17, 2008, respectively, alleging an inability to work since February 1, 2005,[2] due to heart problems.  (Doc. 11, pp. 291, 298, 386).  For DIB purposes, Plaintiff maintained insured status through December 31, 2009.  (Doc. 11, pp. 150, 304).  An administrative hearing was

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule  25(d)(1) of the Federal Rules of Civil Procedure.

[2] At the administrative hearing held on June 23, 2010, Plaintiff amended his alleged onset date to December 31, 2005. (Doc. 11, p. 102).

1

held on June 23, 2010, at which Plaintiff appeared with counsel and testified. (Doc. 11, pp. 97-126).

In a written decision dated October 26, 2010, the ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work with limitations. (Doc. 11, pp. 131-142). Plaintiff requested review of the unfavorable decision by the Appeals Council. (Doc. 11, p. 463). In a Notice of Appeals Council Action dated January 25, 2012, the Appeals Council advised Plaintiff that it was going to set aside the hearing decision, combine the application with a subsequent application that found Plaintiff disabled at the reconsideration level on July 15, 2011, and send the combined applications back to an ALJ for more action and a new decision. (Doc. 11, pp. 148-153, 351, 353). On May 21, 2012, the Appeals Council entered an order remanding the case back to the ALJ. (Doc. 11, pp. 154-159). A supplemental administrative hearing was held on April 4, 2013. (Doc. 11, pp. 39-95).

By written decision dated September 26, 2013, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Doc. 11, p. 21). Specifically, the ALJ found Plaintiff had the following severe impairments: cardiomyopathy, atrial fibrillation, essential hypertension, gout, and diverticulitis. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Doc. 11, p. 24). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can occasionally climb, balance, crawl, kneel, stoop and crouch. He must avoid hazards, including moving machinery and unprotected heights and must avoid concentrated exposure to dusts, odors, fumes, chemical and poor ventilation.

(Doc. 11, p. 24).  With the help of a vocational expert, the ALJ determined that Plaintiff could perform his past relevant work as a recruiter and a customer support representative.  (Doc. 11, pp. 28-29).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on February 25, 2015. (Doc. 11, pp. 7-9).  Subsequently, Plaintiff filed this action.  (Doc. 1). Both parties have filed appeal briefs and supplemental briefs, and the case is before the undersigned for report and recommendation. (Docs. 14, 15, 21, 22).

The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the supplemental administrative hearing held on April 4, 2013, Plaintiff, who was forty-nine years of age, testified that he had earned his GED.  (Doc. 11, p. 42).  Plaintiff testified that since 2005, he worked as a self-employed computer technician two to three days a week in the morning, or about twenty to twenty-five hours per week.  (Doc. 11, pp. 47-48, 76).  Plaintiff testified his work consisted of mainly virus removal and tuning/cleaning up computers.  (Doc. 11, pp. 51-52).

The medical evidence during the relevant time period reflects the following.  On March 28, 2005, Plaintiff was seen by Dr. Michael F. McGehee for a follow-up.  (Doc. 11, p. 647).  Plaintiff was noted to have a history of gout, hypertension and deep vein thrombosis in his left leg.  Plaintiff reported that he had not taken his medication for the past several days because he ran out of medicine.  Plaintiff denied experiencing palpitations or chest pain on exertion.  Plaintiff indicated that he would like to stop smoking. Upon examination, Plaintiff's heart

showed an irregularly irregular rhythm, a tachycardiac rate, and no murmur, gallop or rub. Plaintiff did not have any back tenderness or edema in his extremities. An EKG revealed atrial fibrillation. Plaintiff was diagnosed with hypertension and atrial fibrillation with an unknown time of onset. Plaintiff declined a further work-up of his cardiac problem due to financial concerns.

On November 4, 2005, Plaintiff was seen by Dr. McGehee for a follow-up for his hypertension. (Doc. 11, p. 646). Plaintiff was noted to have atrial fibrillation but had not had this worked up due to financial concerns. Plaintiff was noted to smoke and occasionally drink alcohol. Plaintiff denied any chest pain on exertion or peripheral edema. Upon examination, Plaintiff's heart showed an irregularly irregular rhythm, a regular rate, and no murmur, gallop or rub. Plaintiff did not have any back tenderness or edema in his extremities. Plaintiff was diagnosed with hypertension and atrial fibrillation. Plaintiff's medication was adjusted, and it was stressed that he needed to see a cardiologist. Plaintiff was prescribed medication and encouraged to stop smoking.

On August 10, 2006, Plaintiff entered the Eureka Walk-In Clinic with complaints of ankle swelling. (Doc. 11, pp. 543-545). Plaintiff complained of swollen ankles and felt that his heart skipped beats. Plaintiff reported these symptoms started about three months ago. Plaintiff reported that he smoked and might drink a cocktail or two in the evenings. Plaintiff denied a change in energy or activity. Upon examination, Dr. Daniel R. Jones noted frequent PC's or irregularly irregular heart rate and rhythm. Plaintiff also exhibited bilateral foot/ankle edema. Plaintiff was noted to have a normal mental status and gait. Plaintiff was prescribed medication and referred to Dr. Churchill for a consult. It was recommended that Plaintiff stop smoking and drinking alcohol.

4

On August 17, 2006, Plaintiff entered the Eureka Walk-In Clinic for a follow-up appointment and lab work.  (Doc. 11, pp. 546-550).  Plaintiff reported good energy and that he was sleeping ok and his foot/ankle swelling had improved.  Plaintiff reported that he had stopped drinking but continued to smoke one-half of a package of cigarettes a day.  Upon examination, Dr. Jones noted trace bilateral foot/ankle edema.  Plaintiff was found to have a normal mental status and gait.

On August 24, 2006, Plaintiff was seen at the Eureka Walk-In Clinic for his weekly INR check.  (Doc. 11, pp. 551-555).  Plaintiff reported that he felt better, had more energy and was walking more without lower extremity pain.  Plaintiff indicated that he had no complaints or issues and would be seeing a cardiologist next Thursday.

On August 30, 2006, Plaintiff was seen at the Eureka Walk-In Clinic for his weekly INR check.  (Doc. 11, pp. 556-557).

On August 31, 2006, Plaintiff was seen by Dr. David A. Churchill upon the referral of Dr. Jones due to Plaintiff's shortness of breath and lower extremity edema.  (Doc. 11, pp. 677-678).  Dr. Churchill noted that Plaintiff had significant cardiac enlargement and had been started on medication. Plaintiff reported that he had been feeling better.  Dr. Churchill noted that Plaintiff smoked but was trying to quit.  After examining Plaintiff and test results, Dr. Churchill recommended a transesophageal echocardiogram with bubble study.  (Doc. 11, p. 1214).

On September 6, 2006, Plaintiff was seen at the Eureka Walk-In Clinic for his weekly INR check.  (Doc. 11, pp. 558-559).  Plaintiff denied a cough or dyspnea.

On September 19, 2006, Plaintiff was seen at the Eureka Walk-In Clinic for his weekly INR check.  (Doc. 11, pp. 560-561).

On September 26, 2006, Plaintiff was seen by Dr. Churchill for a re-evaluation and follow-up. (Doc. 11, pp. 676, 1214).  Dr. Churchill noted that Plaintiff had undergone a stress echo that showed significant enlargement of the right-sided heart chambers.  Plaintiff reported some dyspnea on exertion and loss of energy.   Dr. Churchill recommended a heart catheterization and medication.

On October 3, 2006, Plaintiff was seen at the Eureka Walk-In Clinic for his weekly INR check.  (Doc. 11, pp. 562-563).  Plaintiff's problem was noted as chronic and stable. It was recommended that Plaintiff undergo a sleep study.

On November 7, 2006, Plaintiff was seen by Dr. Churchill for a re-evaluation of his atrial fibrillation and diminished left ventricle function.   (Doc. 11, pp. 674-675, 903-905).  A recent heart catheterization revealed normal coronaries and global hypokinesis with an ejection fraction of 35-40%.   Plaintiff reported that he had stopped smoking.   Dr. Churchill recommended Plaintiff continue with his current medications. Dr. Churchill also referred Plaintiff to Dr. Ensley. Plaintiff was instructed to get on a walking or stationary bike program.

On December 4, 2006, Plaintiff was seen by Dr. R. Douglas Ensley as a second opinion for his cardiomyopathy.  (Doc. 11, pp. 526-529).  Dr. Ensley noted that Plaintiff's cardiac history dated back to August of 2006 when he presented with shortness of breath and peripheral edema.  At that time, Plaintiff was found to be in sustained atrial fibrillation. Dr. Ensley noted Plaintiff had undergone a stress echocardiogram that showed normal left ventricular systolic function and demonstrated right ventricular enlargement and dysfunction with no evidence of

6

ischemia.  Plaintiff was also found to have severe tricuspid insufficiency, as well as right-sided chamber enlargement.  Plaintiff also underwent a cardiac catheterization that revealed normal coronaries and a decreased left ventricular function.  Dr. Ensley noted that since August Plaintiff had been treated with medication.  Dr. Ensley noted Plaintiff's report of shortness of breath only with moderate, vigorous activity.  Plaintiff reported that he could walk on a flat surface at a moderate pace for about a mile before stopping due to shortness of breath.  Plaintiff denied pedal edema on his current Lasix dosage.   Plaintiff denied chest discomfort, palpitations, tachycardia, syncope or presyncope.  Plaintiff reported that he exercised on a regular basis, occasionally consumed alcohol and walked every day. Dr. Ensley recommended medical therapy and a MRI to rule out ventricular dysplasia.

On December 12, 2006, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (Doc. 11, pp. 564-565).  Plaintiff was also being seen for a follow-up on lab work ordered by Dr. Ensley.  Dr. Jones noted Plaintiff was last seen in October.  Plaintiff denied any changes to his energy or activity.

On February 26, 2007, Plaintiff underwent an echocardiaography stress test that revealed good exercise tolerance without inducible chest pain or EKG changes indicative of ischemia; and significant left ventricular systolic dysfunction.  (Doc. 11, pp. 823-824).

On March 28, 2007, Plaintiff was seen at the Eureka Walk-In Clinic for a nurse visit. (Doc. 11, pp. 566-567).  Plaintiff reported that he had read on the internet that one of the side effects for a medication that he was taking was shortness of breath. Plaintiff reported that he sometimes experienced shortness of breath on exertion.  Plaintiff reported that he smoked

daily. Dr. Jones noted that Plaintiff had no signs of pedal or pulmonary edema.  Plaintiff was instructed to stop taking Coumadin.

On May 16, 2007, Plaintiff was seen at the Eureka Walk-In Clinic for his routine lab work.  (Doc. 11, pp. 568-569).  Plaintiff was instructed to continue his Coumadin.

On October 9, 2007, Plaintiff was seen by Dr. Churchill. (Doc. 11, p. 673).  Dr. Churchill noted that Plaintiff had not been seen for about a year.  Dr. Churchill noted Plaintiff had been seen by Dr. Ensley who recommended Plaintiff get a MRI but Plaintiff had not done so due to financial constraints.  Plaintiff had done well on medications and was doing fairly well until he started having knee pain.  After looking things up on the internet, Plaintiff decided to stop taking some of his medication. Dr. Churchill stressed the importance of taking his medication and suggested Plaintiff make an appointment with Dr. Ensley to determine a definitive diagnosis.

On November 2, 2007, Plaintiff complained of some pain in his right foot for about a month.  (Doc. 11, p. 645).  Plaintiff reported that he continued to smoke.  Upon examination, Dr. McGehee noted Plaintiff's back was nontender and his extremities showed full range of motion in all joints.  Plaintiff's feet were noted as being reddish/purple, bilaterally.  Plaintiff was noted as being tender with range of motion in the right ankle. Plaintiff was diagnosed with gout and atrial fibrillation.  Plaintiff was instructed to resume taking Allopurinal for his gout. It was suggested that Plaintiff's circulation be tested at his next appointment with the cardiologist.

On November 12, 2007, Plaintiff was seen by Dr. Ensley.  (Doc. 11, pp. 520-525). Dr. Ensley noted that he had seen Plaintiff for a single visit about one year ago.  At that time,

Plaintiff presented with the onset of congestive heart failure in August of 2006 and was found to be in sustained atrial fibrillation. Plaintiff was found to have severe right ventricular enlargement on his initial echo and left ventricular function at that time was reportedly normal. Later, a cardiac catheterization showed angiographic normal coronaries but with global left ventricular hypokinesis with an ejection fraction in the 35-40% range. Dr. Ensley noted at the time of his original visit with Plaintiff he felt Plaintiff had an idiopathic cardiomyopathy and recommended the use of medical therapy and further testing. Dr. Ensley noted that due to Plaintiff's lack of insurance the testing was never performed. Plaintiff reported that over the past year he had done well and experienced only very mild exertional dyspnea. Plaintiff reported that he thought he could walk a mile without stopping due to shortness of breath although this activity was actually limited due to his arthralgias. Dr. Ensley noted that the etiology of the arthralgias was unclear although it was thought it might be caused by gout. Plaintiff reported that he had not had palpitations, syncope or near syncope. Plaintiff indicated that he smoked. Dr. Ensley indicated that Plaintiff's systolic heart failure was currently well compensated. With respect to Plaintiff's cardiomyopathy, Dr. Ensley recommended a primary prevention defibrillator. Plaintiff was also prescribed medication.

On November 21, 2007, Plaintiff underwent ankle brachial indices with segmental pressures and a bilateral lower extremity arterial ultrasound. (Doc. 11, pp. 654-656). These studies revealed no sonographic evidence of hemodynamically significant peripheral vascular occlusive disease of the lower extremities.

On November 30, 2007, Plaintiff was seen at the Eureka Walk-In Clinic. (Doc. 11, pp. 570-571). Plaintiff reported experiencing orthostatic hypotension that morning upon getting out of bed. Dr. Jones noted that Plaintiff's Coreg was recently increased and Plaintiff was

9

started back on Aldactone.  Plaintiff reported similar dizziness the day before.  Plaintiff also complained of soreness in the left abdomen that was similar to his prior episodes of diverticulitis.  Plaintiff reported that he no longer smoked.  Upon examination, Dr. Jones noted Plaintiff did not have a cough or dyspnea.  Plaintiff had an irregularly irregular heart rate and rhythm.  Plaintiff also had mildly diffuse lower left quadrant tenderness.  Plaintiff had a normal mental status and gait.  Dr. Jones adjusted a few medications. Dr. Jones noted that he spoke with Dr. Ensley who agreed with the assessment and plan.

On December 4, 2007, Plaintiff reported experiencing shortness of breath and feeling exhausted.  (Doc. 11, pp. 1236-1237).  Plaintiff reported that he was on antibiotics for his diverticulitis and wondered if that might be causing his problems.  Plaintiff reported he was unable to walk two flights of steps.  Plaintiff denied chest pain or swelling.  Plaintiff noted a change when his Coreg was increased.  Plaintiff was working on insurance coverage for his procedure.

On December 6, 2007, Plaintiff underwent an abdominal CT that revealed diverticulitis.  (Doc. 11, pp. 897-898).

On December 14, 2007, Plaintiff was seen at the Eureka Walk-In Clinic.  (Doc. 11, pp. 573-575).  Dr. Jones noted that Plaintiff was on Coumadin for Afib and that he would like to go to Aspirin only.  Plaintiff denied any recent stress or activity changes. Plaintiff was noted as smoking one package of cigarettes a day.  Plaintiff denied dyspnea on exertion.  Dr. Jones noted that after some discussion Plaintiff decided to stay on Coumadin.

On December 21, 2007, Plaintiff was seen at the Eureka Walk-In Clinic.  (Doc. 11, pp. 576-578). Plaintiff was in for lab work but also complained of pain in his joints.  Upon

examination, Plaintiff did not have a cough or dyspnea.  Dr. Jones noted that Plaintiff's left calf was nontender but his left thigh just above the knee was tender with some firmness/palpable cord.  Plaintiff was noted to have a normal mental status and gait.

On January 3, 2008, Plaintiff underwent a chest x-ray.  (Doc. 11, p. 653).  Plaintiff was found to have a little peribronchial thickening suggestive of a viral lower respiratory infection.

On January 28, 2008, Plaintiff had his initial consultation with Dr. James C. Cooper regarding the possible ICD implantation.  (Doc. 11, pp. 669-672, 679).  Dr. Cooper noted Plaintiff had significant ventricular involvement with severe tricuspid valve prolapse but interestingly denied orthopnea, paroxysmal nocturnal dyspnea or edema. Plaintiff reported he was able to walk one mile without shortness of breath.  Dr. Cooper noted that Plaintiff worked as a computer engineer.  After examining Plaintiff, Dr. Cooper recommended Plaintiff obtain and echocardiogram, a 48 hour Holter monitor study, an ECG and T wave testing and return for a follow-up in eight weeks.

On March 4, 2008, Plaintiff was seen at the Eureka Walk-In Clinic for lab work.  (Doc. 11, pp. 579-580).  Plaintiff reported that he had three recent deaths in his family. Plaintiff was hypertensive but had not checked his blood pressure recently.

On April 16, 2008, Plaintiff was seen at the Eureka Walk-In Clinic for lab work.  (Doc. 11, pp. 581-582).  Upon examination, Plaintiff had no dyspnea and had a normal mental status and gait.  Plaintiff's INR was noted as out of range so his Coumadin dosage was adjusted.

On April 22, 2008, Plaintiff reported that he experienced dyspnea with walking. (Doc. 11, pp. 666).  After reviewing testing results, Dr. Cooper recommended Plaintiff undergo ICD implantation.

On April 23, 2008, Plaintiff was seen at the Eureka Walk-In Clinic.  (Doc. 11, pp. 584-585). Plaintiff reported that he started fish oil supplements and had not changed his Coumadin dosage. Plaintiff also complained of rectal pain without bleeding.  Dr. Joseph Parker adjusted Plaintiff's medications and instructed Plaintiff to return in one week.

On May 7, 2008, Plaintiff was seen at the Eureka Walk-In Clinic for lab work.  (Doc. 11, pp. 586-587). Plaintiff's Coumadin dosage was adjusted.

On June 9, 2008, Plaintiff was admitted into Washington Regional Medical Center to undergo the implantation of a cardioverter-defibrillator performed by Dr. Cooper.  (Doc. 11, pp. 605-612, 614-636, 1273-1288). Upon admission, Plaintiff reported that he could walk about one mile before experiencing shortness of breath.  Plaintiff underwent a chest x-ray that revealed no complication of the pacemaker placement and borderline cardiomegaly.  Plaintiff was discharged on June 10, 2008, in stable condition.  Upon discharge, Plaintiff was instructed to start gradual daily walking, to take his blood pressure twice a day, and to refrain from raising his left arm above shoulder level or lifting more than ten pounds for two weeks.

On July 1, 2008, Plaintiff was seen at the Northwest Arkansas Heart and Vascular Center for a wound check.  (Doc. 11, pp. 664).  The wound was noted as looking well with approximate redness and tenderness.  A cardiac monitor was ordered.

On July 23, 2008, Plaintiff was seen by Dr. McGehee due to some swelling and redness of the left elbow for several months.  (Doc. 11, pp. 640-644). Plaintiff reported that it did not really bother him.  Plaintiff also needed lab work done.  Upon examination, Dr. McGehee noted Plaintiff's back was without CVA or flank tenderness and his extremities showed full range of motion in all joints.  Fluctuance and swelling was noted in the left olecranon bursa.

12

Plaintiff was instructed to increase his Coumadin.  Plaintiff indicated he would consider seeing an orthopedic doctor.

On August 27, 2008, Dr. Churchill reported that Plaintiff experienced shortness of breath after walking twenty-five feet.  (Doc. 11, p. 661).

On September 23, 2008, Plaintiff was seen at the Northwest Arkansas Heart and Vascular Center.  (Doc. 11, p. 663).  Plaintiff reported that he sometimes experienced dizziness upon standing.  Plaintiff denied experiencing palpitations, syncope, presyncope, fatigue, chest pain, dyspnea, or edema.

On October 1, 2008, Plaintiff was seen at the Eureka Walk-In Clinic for his routine lab work.  (Doc. 11, pp. 721-722).  Plaintiff was instructed to continue his Coumadin.

On November 20, 2008, Plaintiff was seen at the Eureka Walk-In Clinic for complaints of left elbow bursitis and a cough.  (Doc. 11, pp. 723-724). Plaintiff indicated that it hurt if he bumped his elbow. Plaintiff reported that his elbow pain had not prevented his ability to work or perform activities.  Plaintiff also complained of a cough and head congestion. Plaintiff reported on a typical day he would spend his time working.  Plaintiff reported that he smoked. Plaintiff denied recent depression. Plaintiff denied experiencing shortness of breath on exertion.  Upon examination, Plaintiff's heart had a regular rate and rhythm and he had a normal mental status and gait.  Plaintiff's left elbow was mildly inflamed with palpable effusion and tenderness. Plaintiff was diagnosed with benign essential hypertension, olecranon bursitis, atrial fibrillation, other malaise and fatigue and acute bronchitis.  Plaintiff received an injection in his left elbow and was instructed to ice his elbow four times a day for about fifteen minutes.  Plaintiff was instructed to stop smoking.

On November 24, 2008, Plaintiff underwent an exercise stress test. (Doc. 11, p. 718). After reviewing the test results, Dr. Cooper recommended that Plaintiff undergo a stress echo cardiogram.

On December 3, 2008, Plaintiff underwent x-rays of the left elbow that revealed a normal left elbow. (Doc. 11, p. 736).

On December 5, 2008, Plaintiff was seen at the Orthopaedic and Sports Medicine Clinic for his left elbow swelling. (Doc. 11, pp. 743). Treatment notes indicate Plaintiff was a self-employed computer technician with a history of high blood pressure, hypertension and gout. Plaintiff's left elbow was noted as having the appearance and swelling consistent with gout tophi. Dr. Joseph M. Ricciardi noted Plaintiff recently had a cortisone injection and cautioned Plaintiff to proceed cautiously with injections.

On December 18, 2008, Plaintiff was seen by Dr. Ricciardi to discuss surgical intervention for his left elbow. (Doc. 11, pp. 745-746). Surgery was scheduled for December 24, 2008.

On December 23, 2008, Plaintiff underwent chest x-rays that revealed the upper limits of a normal heart size and no acute infiltrate, atelectasis or congestion. (Doc. 11, p. 737).

On January 13, 2009, Plaintiff was seen by Dr. Churchill for a follow-up for his dilated cardiomyopathy. (Doc. 11, pp. 717). Plaintiff denied shortness of breath, paroxysmal nocturnal dyspnea or orthopnea. Plaintiff denied syncope but reported occasional palpitations. Plaintiff reported that he had a recent upper respiratory infection. Upon examination, Dr. Churchill noted Plaintiff's heart sounded normal with a regular rhythm. No lower extremity edema was observed. Plaintiff was to return in one year.

On January 15, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for a follow-up visit and to have his Potassium level checked.  (Doc. 11, pp. 726-728). Dr. Jones noted that Plaintiff had a recent elevated Potassium level and was told to stop taking his spirondactone. It was discovered that Plaintiff was also taking Potassium prescribed by Dr. Ensley.  Plaintiff was uncertain if treatment was helpful but he reported no adverse effects of treatment.  Plaintiff also complained of recent pain and swelling of the left middle finger. Plaintiff was diagnosed with atrial fibrillation, unspecified monoarthritis involving the hand, gout unspecified, and hyperpotassemia.  Plaintiff was also referred to a rheumatologist.

On February 16, 2009, Plaintiff underwent a consultative cardiac evaluation performed by Dr. Ron Revard.  (Doc. 11, pp. 703-706).  Plaintiff denied experiencing chest pain but complained of shortness of breath and dizziness.  Plaintiff reported that he was trying to stop smoking and that that he drank alcohol occasionally.  Upon examination, Plaintiff was found to have gout in his left knee.  Dr. Revard diagnosed Plaintiff with congestive heart failure, hypertension, tobacco use, cardiomegaly and AICD/pacemaker.

On March 9, 2009, Plaintiff was seen at the Eureka Walk-In Clinic complaining of gout and high blood pressure. (Doc. 11, pp. 729-731). Dr. Jones noted that Plaintiff's gout problem started 5 weeks ago.  Plaintiff reported persistent migratory pain and inflammation in the knees and ankles, specifically the left ankle.  Dr. Jones noted Plaintiff had only been back on his medication for three days.  Plaintiff reported that he had been unable to work.  Upon examination, Plaintiff was noted to have a mildly tender and edematous left ankle.  Plaintiff was diagnosed with atrial fibrillation, unspecified gout and other primary cardiomyopathies.

On March 26, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (732-733). Upon examination, Dr. Jones noted Plaintiff had no cough or dyspnea.  Plaintiff also had a normal mental status and gait.

On April 3, 2009, Dr. Ronald Crow, a non-examining medical consultant, completed a RFC assessment stating that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds; could stand and/or walk for a total of at least two hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that postural, manipulative, visual, communicative or environmental limitations were not evident. (Doc. 11, pp. 707-714). After reviewing all the evidence, Dr. Jerry Mann affirmed Dr. Crow's findings on July 13, 2009. (Doc. 11, p. 752).

In a Progress Notes dated April 13, 2009, Dr. Boris Bogomilov noted that Plaintiff was in for a six month device check.  (Doc. 11, pp. 715-716). Plaintiff had no complaints.  Plaintiff denied experiencing fatigue, chest pain, palpitations, syncope, lightheadedness, shortness of breath or muscle cramps.  Plaintiff was to return for a device check in six months.

On April 27, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work.  (Doc. 11, pp. 734-735).  Upon examination, Dr. Jones noted no shortness of breath and a normal mental status and gait.

On August 5, 2009, Plaintiff was seen by Dr. Ronald Rubio at North Arkansas Rheumatology complaining of gout.  (Doc. 11, pp. 756-761).  Plaintiff reported that since he discontinued his gout medication he noticed more frequent gout attacks in his knees and ankles. Plaintiff reported a flare-up in his hand and that he had nodules removed from his left elbow.

Dr. Rubio noted that during this visit Plaintiff complained of intermittent knee pain and stiffness especially with prolonged weight bearing.  Plaintiff had medication adjustments made and lab work ordered.

On August 21, 2009, Plaintiff was seen for a follow-up for his gout by Dr. Rubio.  (Doc. 11, pp. 755).  Plaintiff reported no more gout attacks since his last visit.  Plaintiff was able to tolerate his medications and complained of intermittent soreness and stiffness in his knees.  Upon examination, Plaintiff exhibited positive crepitation to both knees.

On September 4, 2009, Plaintiff was seen for a device follow-up with Dr. Bogomilov.  (Doc. 11, pp. 863-866).  Plaintiff denied presyncope, syncope, chest pain or shortness of breath.  Dr. Bogomilov noted that Plaintiff was doing fairly well.  Plaintiff was referred to Dr. Churchill for a cardiac ultrasound.

On September 16, 2009, Plaintiff was seen at Mercy Clinic for a thumb injury.  (Doc. 11, 1061).  Plaintiff reported he slammed a door on his thumb three days ago.  Upon examination, Plaintiff's thumb was noted as markedly swollen with some hemorrhaging under the nail.  Plaintiff was able to flex and extend his thumb.

On September 17, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work and a thumb injury.  (Doc. 11, pp. 775-777).  Plaintiff reported that he shut his thumb in a car door.  Plaintiff reported his thumb injury made it hard to work on the computer.  Plaintiff was instructed soak his thumb for ten minutes once or twice a day.

On November 2, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for medication refills and lab work. (Doc. 11, pp, 778-780). Plaintiff reported no recent atrial fibrillation or gout symptoms.  Plaintiff was continued on his treatment plan.

On November 9, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (Doc. 11, pp, 781-783).  Plaintiff reported he had missed some of his medication the previous week. Plaintiff was continued on his treatment plan.

On November 13, 2009, Plaintiff was seen at NWA Heart and Vascular for a six month device check.  (Doc. 11, pp. 861).  Plaintiff had no current complaints.  Plaintiff denied chest pain, dyspnea, bilateral lower extremity edema, dizziness, or fatigue.

On November 17, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (Doc. 11, pp, 784-785).  Plaintiff was continued on his treatment plan.

On November 23, 2009, Plaintiff was seen by Dr. Rubio for a follow-up appointment. (Doc. 11, p. 754).  Plaintiff's cardiomyopathy was noted as stable.  Plaintiff was scheduled to see a hematologist for his polycythemia.

On November 24, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (Doc. 11, pp, 786-787).  Plaintiff was continued on his treatment plan.

On December 1, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (Doc. 11, pp, 788-789).  Plaintiff was continued on his treatment plan.

On December 7, 2009, Plaintiff was seen at Highlands Oncology Group after being diagnosed with polycythemia.  (Doc. 11, pp. 825-827).  Plaintiff reported that he had a good energy level and denied muscle pain, swollen joints, spinal tenderness or joint redness. Plaintiff reported that he was working and that he smoked cigarettes.  Upon examination, Plaintiff had normal muscle strength, a normal gait and no focal motor deficit.  Dr. Gregory Oakhill recommended a phlebotomy program.  Plaintiff underwent a phlebotomy on January

1, 2010, February 22, 2010, March 19, 2010, May 4, 2010, May 24, 2010, July 6, 2010, July 30, 2010, August 16, 2010, October 25, 2010, January 14, 2011, January 24, 2011, May 2, 2011, July 13, 2011, October 7, 2011, January 6, 2012, April 3, 2012, September 28, 2012, (Doc. 11, pp. 828-836, 924-944, 1002-1037).

On December 9, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (Doc. 11, pp, 790-791).  Plaintiff was noted to have been recently diagnosed polycythemia which required regular phlebotomy.  Plaintiff was continued on his treatment plan.

On December 15, 2009, Plaintiff was seen by Dr. Churchill for a follow-up evaluation. (Doc. 11, p. 808).  Plaintiff was noted to have lost a lot of weight.  Plaintiff denied chest pain, chest discomfort, orthopnea, paroxysmal nocturnal dyspnea, presyncope, syncope or edema. Plaintiff was diagnosed with stable non-ischemic cardiomyopathy with improvement in left ventricle function and chronic atrial fibrillation.   Plaintiff was prescribed medication and instructed to return in one year.

On December 16, 2009, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (Doc. 11, pp, 792-793).  Plaintiff was continued on his treatment plan.

On April 22, 2010. Plaintiff was seen at the Eureka Walk-In Clinic for testing and abdominal pain.  (Doc. 11, pp. 794-796).  Plaintiff reported his abdominal pain was similar to the pain associated with his diverticulitis in the past and that he had been taking antibiotics. Plaintiff was prescribed medication and instructed to improve his diet and exercise.

On May 21, 2010, Plaintiff was seen at NWA Heart and Vascular for his six month device check.  (Doc. 11, pp. 838-857). Plaintiff denied chest pain, dyspnea, bilateral lower extremity edema, dizziness, or fatigue.

On August 16, 2010, Plaintiff was seen at the Eureka Walk-In Clinic for medication refills and related medical problems. (Doc. 11, pp. 919-921).  Plaintiff was satisfied with treatment for his gout and blood thinner.  Plaintiff reported he had been having his lab work done at another clinic.

On September 30, 2010, Plaintiff was seen at the Eureka Walk-In Clinic for lab work. (Doc. 11, pp. 922-923).  Plaintiff reported he had been on the road a lot recently.  Plaintiff was continued on his treatment plan.

On April 25, 2011, Dr. David L. Hicks, a non-examining medical consultant, completed a RFC assessment stating that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds; could stand and/or walk for a total of at least two hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that postural, manipulative, visual, communicative or environmental limitations were not evident. (Doc. 11, pp. 959-966). After reviewing all the evidence, Dr. Bill F. Payne affirmed Dr. Hick's findings on July 14, 2011. (Doc. 11, p. 972).

On June 7, 2011, Plaintiff underwent a consultative mental diagnostic evaluation performed by Dr. Mary J. Sonntag.  (Doc. 11, pp. 967-971).  Plaintiff reported that he found it hard to stay focused for periods of time.  Plaintiff reported that he needed no assistance with activities of daily living.  For the past five years, Plaintiff indicated that he had worked in a computer business for about twenty to twenty-five hours per week.  Dr. Sonntag opined that Plaintiff's symptoms were congruent with major depression.  Plaintiff was diagnosed with major depression and a generalized anxiety disorder. With respect to adaptive functioning,

Plaintiff reported that he could drive; shop independently; handle personal finances; perform activities of daily living independently; and participate in social groups, such as, church.

On July 14, 2011, Dr. Paula Lynch, a non-examining medical consultant, completed a Mental RFC Assessment opining that Plaintiff was markedly limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Doc. 11, pp. 975-978).

On the same date, Dr. Lynch completed a Psychiatric Review Technique form opining that Plaintiff had moderate restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and one or two episodes of decompensation, each of an extended duration. (Doc. 11, pp. 979-992).

On January 27, 2012, Plaintiff was seen for a follow-up for his atrial fibrillation and defibrillator. (Doc. 11, pp. 1356-1359). Plaintiff denied syncope, presyncope and chest pain but admitted to his usual shortness of breath. Upon examination, Dr. Bogomilov noted mild lower extremity edema and varicosities. Plaintiff's defibrillator was adjusted and Plaintiff was given a prescription of Xarelto and asked to check with his hematologist and oncologist to see if he could switch to this medication. Plaintiff was to return for a device check in six months.

On January 29, 2012, Plaintiff was seen by Dr. Craig P. Dinger for the first time. (Doc. 11, pp. 1099-1103). Plaintiff reported that he continued to smoke. Plaintiff reported that he was disabled because of his heart disease. Plaintiff indicated that he exercised three times a week, for thirty minutes and worked as a computer tech. Upon examination, Dr. Dinger noted

21

Plaintiff had no edema in his extremities. Plaintiff was diagnosed with cardiomegaly, myocardiopathy, hemochromatosis, and tobaccos dependence.

On February 10, 2012, Plaintiff underwent a cardiac ultrasound that revealed severe right atrial and right ventricular enlargement, and moderate depression of left ventricle systolic function. (Doc. 11, pp. 1361-1363).

On February 23, 2012, Plaintiff was seen for lab work. (Doc. 11, pp. 1097-1098). Treatment notes indicated that Plaintiff saw Dr. Bogomilov two weeks ago and was waiting for his echo results. Plaintiff reported a tightness in his throat and chest when he began eating. Plaintiff reported that it felt like food was getting stuck and he had to swallow several times. Dr. Dinger recommended Plaintiff have a scope done to evaluate his esophagus. Plaintiff was to return in three months.

On March 6, 2012, Plaintiff was seen by Dr. Churchill. (Doc. 11, pp. 1428). Plaintiff denied orthopnea or edema. Plaintiff reported that he had been walking on the treadmill without difficulty or chest pain. Plaintiff indicated that Dr. Bogomilov wanted Plaintiff to discuss the echocardiogram that had been ordered. Dr. Churchill noted that Plaintiff's extremities showed no edema. Dr. Churchill indicated that there was nothing further that he could do and that Plaintiff should continue his present medications. Plaintiff was to return as needed.

On April 2, 2012, Plaintiff was seen by Deborah Clay, LPC, at Ozark Guidance. (Doc. 11, pp. 1063-1069). Plaintiff reported weekly anxiety and inattention/distractibility/decreased concentration and daily depression. Plaintiff reported anxiety related to lack of business, an inability to work full-time or part-time because of medical appointments and his ICD

placement.  Plaintiff reported his minor depressive symptoms began five years ago when his business began to fail due to the economy and his symptoms worsened when he was diagnosed with an enlarged heart. It was recommended that Plaintiff start therapy and undergo a psychiatric diagnostic assessment.

On April 17, 2012, Plaintiff was seen by Dr. Latifat Ogon at Ozark Guidance.  (Doc. 11, pp. 1070-1073).  Plaintiff indicated that he was tired and worried about bills.  Plaintiff reported that he was unable to keep his personal business going because he could not put the hours into the business due to his fatigue.  Dr. Ogon recommended individual counseling. Plaintiff was also seen for individual therapy on this date.  (Doc. 11, pp. 1088-1090).

On May 9, 2012, Plaintiff was seen at Ozark Guidance for individual therapy.  (Doc. 11, pp. 1084-1085).  Plaintiff reported that he had some dental work done which made him feel good.  Plaintiff also moved his shop to a new location which helped with his self-image. Plaintiff asked to be on a mild antidepressant. Ms. Clay contacted Plaintiff's primary care doctor, Dr. Dinger, who said he would call in a prescription.  Dr. Dinger wanted Plaintiff to see a mental health physician.  Ms. Clay noted Plaintiff was making good progress.

On June 8, 2012, Plaintiff was in for a medication follow-up.  (Doc. 11, pp. 1094-1096). Plaintiff reported he had been doing well with his blood pressure control since the last visit. Plaintiff reported that he exercised regularly and did not use tobacco or drink alcohol. However, Dr. Dinger's treatment notes also reported that Plaintiff smoked and drank socially as well. Plaintiff reported that his depression had worsened.  Plaintiff was diagnosed with hypertension and depression.

On July 27, 2012, Plaintiff was seen for a six month device check-up.  (Doc. 11, pp. 1395-1402).  Plaintiff denied chest pain, dyspnea, syncope, bilateral lower extremity edema, or fatigue.  Dr. Bogomilov noted Plaintiff was on Xaralto.

On August 1, 2012, Plaintiff was seen by Ms. Clay for a master treatment review.  (Doc. 11, pp. 1078-1083).  Plaintiff was noted as making positive steps but then missed some appointments due to financial stress and lack of transportation.

On August 2, 2012, Plaintiff attended individual therapy with Ms. Clay.  (Doc. 11, pp. 1086-1087).  Plaintiff reported that he had begun accepting his limitations but was still somewhat minimally depressed.  Plaintiff decided to discontinue the use of antidepressants as he wanted to get through things on his own.  Ms. Clay noted that Plaintiff appeared to have the coping skills to address his medical problems and was doing well on most days.

On October 29, 2012, Plaintiff complained of a cough.  (Doc. 11, pp. 1091-1093).  Plaintiff denied dyspnea, wheezing, myalgias and chest pain.  Plaintiff reported that he smoked and drank socially.  After examining Plaintiff, Dr. Dinger diagnosed Plaintiff with esophageal reflux and allergic rhinitis.

On January 17, 2013, Plaintiff was seen by Dr. Bogomilov.  (Doc. 11, pp. 1404-1407).  Plaintiff denied syncope, presyncope and chest pain but admitted to his usual shortness of breath.  Dr. Bogomilov noted Plaintiff was in for a change out.  Upon examination, Plaintiff was noted to have mild lower extremity edema and varicosities.  Plaintiff was noted as doing fairly well from an EP standpoint although he had Class III systolic heart failure.

On January 21, 2013, Dr. Dinger completed a Physical Residual Functional Capacity Questionnaire wherein he opined Plaintiff would need to take two, twenty to thirty minute

unscheduled work breaks to elevate his legs with prolonged sitting, and to be absent from work about twice a month.  (Doc. 11, pp. 1038-1042, 1429-1433).  Plaintiff was to refrain from working a job with increased risk of physical injury or a job that was strenuous.

On January 23, 2013, Ms. Misti Patti, APN completed a Cardiac Residual Functional Capacity Questionnaire.  (Doc. 11, pp. 1043-1048).  Nurse Patti opined that Plaintiff's physical symptoms could possibly affect him emotionally.  Nurse Patti further indicated that Plaintiff would sometimes need to elevate his legs, that Plaintiff could not lift fifty pounds and should not use heavy equipment repetitively for fear of an ICD lead fracture.

On July 19, 2013, Plaintiff underwent a mental diagnostic evaluation performed by Dr. Terry L. Efird.  (Doc. 11, pp. 1435-1441).  Plaintiff reported that his mood was "kind of hopeless."  Plaintiff also reported depression and excessive worry.  Plaintiff endorsed the ability to perform basic self-care tasks independently and to perform household chores adequately.  Plaintiff reported that he had primarily worked as a recruiter for data processing. Plaintiff indicated that he had started a computer repair business and continued to do computer repair.  Plaintiff was diagnosed with a major depressive disorder and a generalized anxiety disorder. With respect to adaptive functioning, Plaintiff endorsed the ability to drive unfamiliar routes, to shop independently, to hand personal finances, to perform most activities of daily living adequately, to visit with family one to two times per month and to interact with friends or customers.  Dr. Efird opined that Plaintiff had the capacity to perform basic cognitive tasks for basic work-like activities.  Dr. Efird also completed a mental RFC opining that Plaintiff had minimal limitations in all areas of functioning.

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c (a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

## IV.    Discussion:

Plaintiff argues the following issues on appeal: 1) the ALJ erred in not finding Plaintiff disabled when his doctor appointments required that Plaintiff miss two or more days of work a month; 2) the ALJ erred by not having a supplemental hearing after proffering a consultative examination; 3) the ALJ erred in determining Plaintiff's severe impairments; 4) the ALJ erred by not finding Plaintiff met a listing or combination of impairments that would preclude work; 5) the ALJ erred in determining Plaintiff's RFC and not assigning weight to all doctor's opinions; 6) the ALJ erred by not relying on the RFC hypothetical set forth in the first set of interrogatories; 7) the ALJ erred in not finding Plaintiff disabled when Plaintiff had already been found to be disabled and did not comply with the Appeals Council order; 8) the ALJ erred in not mentioning witness testimony; and 9) the ALJ erred in failing to find Plaintiff disabled for a closed period of time.

**A.      Appeals Council Act**ion:[3]

In this case, the Appeals Council set aside the October 26, 2010, administrative decision and a subsequent application finding Plaintiff disabled and directed the ALJ to obtain additional evidence as necessary, offer Plaintiff an opportunity for a supplemental hearing and issue a new opinion.  While Plaintiff's counsel appears to argue that the ALJ found Plaintiff to be disabled and just needed an onset date, a review of the record revealed that the ALJ requested that Plaintiff's counsel brief the alleged onset date issue not that Plaintiff had been found to be disabled.  (Doc. 11, pp. 93-94, 284-285).  The ALJ also gave Plaintiff time to issue a statement after reviewing the examination conducted by Dr. Efird, and Plaintiff's counsel failed to timely respond and was not given an extension by the ALJ.  (Doc. 11, pp. 286-287, 290).  After reviewing the record, the Court finds the arguments raised by Plaintiff are meritless in this case and that the ALJ complied with the Appeals Council remand order.

**B.      Insured Status and Relevant Time Periods:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability.  42 U.S.C. § 416(i)(3)(B).  Plaintiff last met this requirement on December 31, 2009.  Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of February 1, 2005,[4] his alleged onset date of disability, through December 31, 2009, the last date he was in insured status under Title II of the Act.

---

[3] The Court combined the second, sixth and seventh issues raised.
[4] The Court notes the ALJ used the original onset date of disability.

In order for Plaintiff to qualify for DIB he must prove that on or before the expiration of his insured status he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that the parties must focus their attention on claimant's condition at the time she last met insured status requirements).

With respect to Plaintiff's SSI application, benefits are not payable prior to the date of application, regardless of how far back disability may, in fact, be alleged or found to extend. See 20 C.F.R. § 416.335. Therefore, the relevant period is from July 17, 2008, the date Plaintiff protectively applied for SSI benefits, through September 26, 2013, the date of the ALJ's decision.

### C.    Plaintiff's Impairments:

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c). While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted). To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p. The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two.   See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).

While the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments during the time period in question, the ALJ stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe.  See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairment as "severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); see also 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 416.923 (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity"). The Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

### D.     Combination of Impairments:

Plaintiff argues that the ALJ erred in failing to consider all of the claimant's impairments in combination.

The ALJ stated that in determining Plaintiff's RFC he considered "all of the claimant's impairments, including impairments that are not severe."  (Doc. 11, p. 20).  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (Doc. 11, p. 24).  Such language demonstrates the ALJ considered the combined effect of Plaintiff's impairments.  Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994).

**E.     Listing of Impairments:**

Plaintiff argues that the ALJ erred by failing to determine that Plaintiff's impairments met a Listing of Impairments pursuant to 20 CFR Part 404, Subpart P, Appendix 1.

The burden of proof is on the Plaintiff to establish that his impairments meet or equal a listing. See Sullivan v. Zebley, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). To meet a listing, an impairment must meet all of the listing's specified criteria. Id. at 530, 110 S.Ct. 885 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify."); Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). "Medical equivalence must be based on medical findings." 20 C.F.R. § 416.926(b) (2003); Sullivan, 493 U.S. at 531 ("a claimant ... must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment").  In this case, the ALJ explicitly found that no treating or examining physician mentioned findings equivalent in severity to the criteria of a listed impairment, and that the medical evidence does not show medical findings that are the same or equivalent to a listed impairment.

After reviewing the entire evidence of record, the Court finds there is sufficient evidence to support the ALJ's determination that Plaintiff's impairments did not medically equal a Listing.

**F.     Subjective Complaints and Symptom Evaluation:**[5]

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5)

---

[5] The first and eighth issues raised by Plaintiff are incorporated into this section.

functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.  A review of the record reveals that during the relevant time period, Plaintiff reported that he was able to take care of his personal needs, do light household cleaning, prepare simple meals, drive, and do other activities of daily living independently.  The record further revealed that during the relevant time period Plaintiff indicated that he worked twenty to twenty-five hours a week as a self-employed computer technician.  In July of 2013, Plaintiff reported to Dr. Efird that he continued to do computer repair; that he was able to drive unfamiliar routes; that he was able to shop independently; that he could handle his personal finances; that he could perform most activities of daily living adequately; that he visited with family once or twice a month; and that he interacted with friends and customers.

With respect to Plaintiff's heart condition and other physical impairments, the record revealed that Plaintiff's heart impairment had been treated and had responded well to the implantation of an ICD and the use of medication.  A review of the record further revealed that Plaintiff's, hypertension, gout and diverticulitis were also kept in control with the use of medication and a proper diet.

With respect to Plaintiff's alleged mental impairments, the record revealed that Plaintiff did not allege a mental impairment in his applications for benefits. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression is later developed). A review of the record also failed to establish that Plaintiff sought on-going and consistent treatment from a mental health provider during the time period in question. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability).

Plaintiff contends that the ALJ failed to consider the testimony of Plaintiff's wife. While the ALJ is "not required to accept all lay testimony ... it is almost certainly error to ignore it altogether." Willcockson v. Astrue, 540 F.3d 878, 881 (8th Cir. 2008); Smith v. Heckler, 735 F.2d 312, 316–17 (8th Cir. 1984) (finding that ALJ's failure to mention three lay witnesses' affidavits suggested that the ALJ overlooked them). However, the ALJ may discount third-party testimony on the same grounds as he or she discounts a claimant's own testimony. Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998). Moreover, failure to specifically discuss and cite evidence does not mean that it was not considered by the ALJ. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted). In the particular case, the Court does not find the ALJ's failure to specifically address third-party testimony reversible error as the same grounds used to discount Plaintiff's testimony also discount the third-party testimony.

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he was unable to engage in any gainful activity during the time period in question. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**G.     ALJ's RFC Determination and Medical Opinions:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

When determining RFC, a treating physician's opinion is given more weight than other sources in a disability proceeding. 20 C.F.R. § 404.1527(c)(2).  When a treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. Id. "However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (alteration in original) (internal

34

quotation omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

In the present case, the ALJ considered the medical assessments of treating, examining and non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform sedentary work with limitations during the time period in question.  The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of examining and non-examining medical professionals, and set forth the reasons for the weight given to the opinions.  Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

With respect to the July 13, 2013, RFC Questionnaire[6] completed by Plaintiff's treating physician, Dr. Dinger, indicating that Plaintiff would have more limitations than determined in the RFC, the Court finds that the ALJ properly discounted this opinion as it is not supported by Dr. Dinger's treatment notes or the record as a whole.  The Court also points out that Plaintiff's oncologist/hematologist consistently opined that Plaintiff was capable of performing sedentary or light work.  (Doc. 11, pp. 1004, 1012, 1018, 1025, 1031, 1035).  After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

---

[6] The Court notes, Plaintiff did not start seeing Dr. Dinger until January 29, 2012, well after the expiration of his insured status in December of 2009.  However, Plaintiff also applied for SSI so this medical evidence is relevant for the SSI application.

35

### H.   Past Relevant Work:

Plaintiff has the initial burden of proving that he suffers from a medically determinable impairment which precludes the performance of past work.  Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991).  Only after the claimant establishes that a disability precludes the performance of past relevant work will the burden shift to the Commissioner to prove that the claimant can perform other work.  Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993).

According to the Commissioner's interpretation of past relevant work, a claimant will not be found to be disabled if he retains the RFC to perform:

> 1.  The actual functional demands and job duties of a particular past relevant job; or
>
> 2.   The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

20 C.F.R. §§ 404.1520(e); S.S.R. 82-61 (1982); Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)(expressly approving the two part test from S.S.R. 82-61).

The Court notes in this case the ALJ relied upon the interrogatories of a vocational expert, who after reviewing the ALJ's proposed hypothetical question which included the limitations addressed in the RFC determination discussed above, opined that the hypothetical individual would be able to perform Plaintiff's past relevant work as performed in the national economy.  See Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("The testimony of a vocational expert is relevant at steps four and five of the Commissioner's sequential analysis, when the question becomes whether a claimant with a severe impairment has the residual functional capacity to do past relevant work or other work") (citations omitted). Accordingly, the Court finds substantial evidence to support the ALJ's finding that Plaintiff could perform

his past relevant work as a recruiter and a customer support representative during the relevant time period.

      **I.**      **Closed Period of Disability:**

After reviewing the record, the Court does not find that the ALJ erred for failing to determine that Plaintiff was disabled for a closed period of disability.  Plaintiff mentions a closed period in his appeal brief but does not cite to the medical evidence to support such a finding.

**V.**      **Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of June 2017.

/s/  *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE